Good morning, everyone. We have six cases on today's calendar, five of which will be argued, and the sixth considered on the briefs. We'll begin with Appeal Number 2833, Lester Sumrall v. LeSEA, Inc., and is it Ms. Hesse? Yes, it is. Good morning to you. May it please the Court. Dr. Lester Sumrall, a well-known evangelist, executed a will on September 28, 1994. He died less than two years later on April 28, 1996. Dr. Sumrall left a majority of his estate to his three sons, Frank, Peter, and Stephen. His estate was sizable, given that 43 books were written by and copyrighted in Dr. Sumrall's name, and there were over 100 books not copyrighted that he authored, and the value of his right of publicity, which was used extensively by LeSEA in its fundraising after his death. In fact, affidavits filed by LeSEA in this matter state that donations exceed $200 million in the prior five years. Yet Frank Sumrall has not received one penny of his inheritance. Dr. Sumrall named his son Steve as executor of the will and Peter as successor executor. Peter died in 2015. Stephen admitted in his response to requests to admit that he never took action as executor. He testified in his deposition that he never distributed the estate assets. He stated that, quote, their hands were full with keeping the ministry going, and that because Dr. Sumrall was gone, funding was down, and, quote, that changed everything, end quote. As for the will, Steve also admitted in his response to requests to admit that he never discussed Dr. Sumrall's will with Frank prior to December of 2016. He also admitted in his response to requests to admit that the first time Frank ever asked about the will was December of 2016. At the Christmas lunch in December of 2016, Frank first learns that there was a will. He then spent – sent repeated text messages to his brother Steve asking for a copy of that will. Ms. Hesse, in the interest of time, what you're doing, which is helpful to some extent, is kind of painting the picture and putting the case on the table here. And, of course, we have your briefs. Yes. And in your brief, you present 12 separate issues for us to consider. It's up to you, but it might help if you narrow that down a bit and focus on, you know, two or three that you think are the most significant. We'll, you know, we'll consider the full presentation, but you put a lot on the table in the brief. Yes, I did. And, Your Honor, the first point that I was going to make is the Right of Publicity Act. And the district court erred there because it was a judgment on the pleading. So Rule 12c applies. And as we know, 12c is treaty. Do you agree that in order to prevail on that, you'd need to amend your complaint? No. Because I do not see any allegation in there of the 50% or greater ownership as to the right of publicity. So, Judge, there's under the Right of Publicity Act, there's two ways. So under Section 18 of that act, if you can sue for infringement if you own over 50%. The theory presented was that there was a forfeiture by Steve and Peter of their inheritance. But where do you allege as to the forfeiture even that it was the forfeiture was as to the right of publicity? So in paragraphs 33 through 36, we pled very broadly that the counterclaim defendants continued to use Dr. Sumrall's works and the right of publicity. That's in paragraph 33 in various activities. That Steve and Peter had possession of the will, but that instead of distributing, they gave those assets to LaCie. So they took in whatever manner that took, whether it was an assignment. You've defined specifically Dr. Sumrall's IP to include his right of publicity. And based on my reading of your complaint, any type of relinquishment or forfeiture allegation focuses on the works, not on the IP, which is where the right of publicity lies. Right. So that was paragraph 90, where the word works was used. You're exactly correct, Judge. But in paragraphs 31 through 36, we specifically mention IP and the right of publicity. But just mentioning that isn't sufficient to establish the forfeiture or relinquishment theory that you're proceeding on. But the theory was— And you also don't allege a greater than 50 percent ownership in the IP. Correct, Your Honor. So the IP was mentioned in paragraph 33 that Steve and Pete had given both, that the works and the IP were given to LaCie. But your theory of recovery, as you just said, is either greater than 50 percent ownership or relinquishment of the IP, of the right of publicity, not relinquishment of everything. And the only relinquishment or forfeiture allegation that I see in the complaint pertains to works, which does not include the right of publicity. Correct. And the forfeiture, the exact language in that paragraph 90 was forfeiture, and you're correct. But there was a second element to the right of publicity act, and that's the accounting. So if there was a party— But where—I don't see any allegations as to an accounting for the IP. Okay. So, Judge, the allegations of an accounting occur at paragraph 37. And how are you—how do those paragraphs pertain to an accounting as to the right of publicity rather than just general language of accounting? So in paragraph 37, that we allege that Peter and Stephen and their heirs used Dr. Sumrall's IP to generate revenue for each of the LaCie entities without accounting to Frank Sumrall. What's the substantive law that governs the accounting claim? It's also the right of publicity act, section 18. Right. So don't they, for the reasons that Judge St. Eva said, don't they rise and fall based upon that? It seemed to me—correct me if I'm wrong—it seemed to me that what you were saying, what you were focused on, and you really came around on this in your reply brief, is saying, look, the district court is right and the defendants are right that there's, my words, not yours, a Scrivener's error in the complaint. In paragraph 90. Right. And the Scrivener's error relates to the definition of works. Correct. Quote, unquote. So I thought your argument was that there's an—the best argument was there's an abuse of discretion for not letting us fix the Scrivener's error. Correct, Judge. We've alleged that. I'm sorry, we've argued that. Because what Judge St. Eve says seems absolutely correct, that it's not defined correctly, maybe because of a Scrivener's error. And number two, the allegations of ownership aren't there. Correct. So it seems to me to come down to was—did the district court abuse its discretion in not letting you fix that? But don't let me talk you into that framing, but that's what I take away from this. Yes, and which is why—let me just add on that. Which is why I asked you my very first question, don't you need to be allowed to amend in order to have stated a claim or prevail on the motion for judgment on the pleadings on the right of publicity claim? Judge, I believe the accounting's already in here. But the accounting is not enough to state a cause of action without the right of publicity. That doesn't—the accounting is not a pathway to a right of publicity claim. Except Section 18 of the Act does say in the subparagraph B, it states that a person described in subsection A—subsection A is the person who owns at least half of the interest. And it says in B— Which is not a ledger. You might be better off to shift your argument to the amendment. Yes. Well, you know, B—just to finish my point, B says that they have a—they have to account to someone who owns less than half. Would a 1% owner have a right to accounting? Yes, as long as it's against someone who has at least 50%. So the 50% owner is the subsection 18A. The right of the accounting is 18B. So we allege that Steve and Peter took their inheritance, which is two-thirds interest, and gave it to Lacy. Therefore, Lacy now owns at least two-thirds interest. They have over 50%. So because they have over 50%, now we, as representing Frank, now has a—he has a right to an accounting from a party who owns more than two-thirds—more than 50%. So that's where the 18B comes in. So I believe that there's various paragraphs, 37, 57, 107, in the complaint that alleges that accounting. We allege that Steve and Pete gave their interest to Lacy. But in any event, if it really comes down to one word in paragraph 90, the judge abused his discretion under Rule 15 to not allow us to amend the complaint. He did it preemptively. I mean, I'm looking right at the paragraphs you're talking about. The allegations regarding ownership, I think Judge Sandy was right, are pretty thin. I mean, 37, 57—I'm looking right at them. Yes. There's not a whole lot set out there in terms of ownership. So we say that Steve and Pete, without accounting to Frank for the IP— Right, because no doubt the word accounting appears. And then in paragraph 70, Steve, Pete, and Peter's heirs owed and still owe Frank a duty to account to Frank for all profits obtained through exploitation of Dr. Sumrall's IP. And then in count three, that 104, counterclaim defendants have never accounted to Frank or the trust for the use of Dr. Sumrall's right of publicity. So that's where we relied on that right of accounting. But if the forfeiture was a mistake based on that paragraph 90, then we do believe and have argued that the judge abused his discretion under Rule 15 in not allowing us to amend. But for your amendment argument, because there was a scheduling order in place, and you were seeking to amend your complaint two years after the deadline and the scheduling order, our case law is very clear that we have to start with Rule 16 first before we get to Rule 15, and that it was on your client to show good cause for seeking the extension beyond—and here we're at two years beyond. How do you meet that good cause requirement of Rule 16 before you ever get to Rule 15? Judge, the district court— When you had already filed three complaints. So let me address both those issues, because the judge preemptively did not even allow it. So when he denied the motion—I'm sorry, granted the judgment on the pleadings motion, he also said it's with prejudice and I'm not allowing leave to amend. We did it preemptively. We didn't have the opportunity. But then second, he was wrong about it being amended three times. What happened is the original counterclaim was pled in 2019. How do you meet your good cause for an amendment? Because Count 3 had never been amended. Never. So when we originally filed the counterclaim in 2019, the parties engaged in settlement. And then in February, the court ruled that there was no settlement and asked the parties for a joint status report. In that joint status report, the parties agreed to allow both sides to amend. So no pleadings, no answer or motions to dismiss had ever been filed on that original counterclaim. So based on that joint status report, the judge ordered, OK, I'm going to let you guys both amend. So the plaintiff amended their complaint. We amended our counterclaim. And so the first time there's motions to dismiss are asked to that first amended. And those motions to dismiss were only granted as to Counts 4 and Count 8. And then we amended to fix the perceived deficiency in Count 4. And there was no issues. The motions to dismiss were denied as to Count 3. Count 3 had never been amended other than the original First Amendment that was given as a result of an agreement by the parties. So, Judge, the other issue on this right of publicity. Before you move to the second portion of that question, we are looking for diligence. If we get to Rule 16 and understanding how long this lawsuit was being pursued, if we move away from prejudice, how do we demonstrate that we're diligent? Even though it had never been amended before, what diligence did we do at this point, kind of this late in the lawsuit, to now want to amend Count 3? And, Judge, we never got the opportunity to even present that diligence or to even make the argument. Because the judge preemptively, when he granted their motion for judgment on the pleadings, specifically said it was prejudice and would not allow the amendment, not giving us the opportunity. We did file a motion to reconsider on the basis that there was this accounting claim that was also included in the count. And it was never ruled upon until almost a year later, and it was just included in a separate order. There was no written opinion on it. It was just included in a later order without mentioning the rules or why it was denied. Our second motion to reconsider was on the basis of the newly found evidence that there was a— Is this the open the proofs? Yes. Okay. Yes. And under Rule 60B, it was an abuse of discretion not to allow us— Rule 60B is exactly fit for this circumstance. It's a document we asked for in discovery in 2020, and we didn't get it until four months after, even though it was signed in 2021 by Steve Sumrall. And it went to the heart of the matter. The issue was who owns Dr. Sumrall's right of publicity, right? And who owns it, and does anyone own over 50 percent? That's the main issue in the case, and now we've got proof that Steve Sumrall did, in fact, retroactively back to Dr. Sumrall's death, assign his interest in the right of publicity to LaCie. And yet this assignment was not given to us until after the judge had ruled on the motion for judgment on pleadings, and the judge simply wouldn't consider it, calling it too little too late. Finally, we had asked several times in that briefing on the motion for judgment on the pleadings to convert it to a motion for summary judgment, given the evidence being considered outside the pleadings. The Seventh Circuit is clear that while the judge has discretion on that issue, that convert to summary judgment, it is not something that the judge no longer has discretion once he- What's your best argument that the court relied on matters outside of the pleadings in ruling on the motion for judgment on the pleadings? I did not see any evidence outside of what was in the complaint or the answer that the court relied on. So, Judge, we cite to it in our briefs with some docket numbers that didn't correspond to my review of the opinion, the judge relying on that. So you can rest on your brief if you want. I will on that issue, Judge. As to the Copyright Act- Before we move there, can we talk a little bit, though, about the judge's ruling on the sham affidavit ruling on portions? And I noticed that we rely pretty heavily on that without acknowledging the court's decision regarding how to treat the affidavit. And so how can we consider that affidavit as evidence? And you're referencing Lester's affidavit. The court never calls it a sham affidavit. That's what the attorneys for Lacy calls it. He never struck it. It's not in his order. He never calls it a sham affidavit. He actually just says that he finds that certain parts of it he thinks contradicts other deposition testimony. But we have shown in our brief on this issue that there's no contradiction. There's simply further explanation on certain issues. But you don't challenge that finding by the court? I don't believe there is a finding on the court. I think it's just in their brief, in the opposing party's brief. Even though the district court says the affidavit contradicts itself, is the hesitation of accepting it because of the label sham affidavit? I just want to make sure I fully appreciate. Yeah, so that's my issue is the judge never called it a sham affidavit and never struck it. It's not in his ruling. He finds, and without explaining, that there's some contradiction. But we explain that in our brief, in the tables that we made, that there really isn't a contradiction. It's just a further explanation. And that goes to the traveler photo claim. Yes. The Copyright Act is one where the judge had to rely on the consumer health case in determining that there was a repudiation of Frank's ownership of copyrights. But that consumer health case. We rely a lot, I noticed, on the Stone case out of the Second Circuit. Does that case not work against you because the time starts running at the moment that the heir recognizes that she is an heir? And so can you make that distinguishing, I guess, for Frank? Yes, because that's exactly the point. There could not be the running of the statute of limitations until she realized she has that right, until she realizes she's the daughter and has an inheritance. Here, we don't know that we have an inheritance until the will is filed with the probate court on April 21st of 2017. So until we have that will, we don't know that we have an inheritance. So just like Hank Williams' daughter doesn't know she has an inheritance, we don't know we have that inheritance until we get that will on April 21st. We then take measures within two years to file our counterclaim. So it's not until that will is produced that Frank even understands he has an inheritance. He's been told this whole time that everything was given to the ministry, despite the fact that Steve and Peter do not. Wasn't it sufficient when he saw his cousin, Andrew, taking things from his grandfather's safe, and then Lester went home and started learning about inheritance and doing some research? Why wasn't that sufficient to put him on notice? Judge, repudiation is a very specific concept of this accrual rule under consumer health. It has to be three things, plain and express. It has to be communicated to the claimant, and it has to repudiate co-ownership. How do you deal with cases or cases like Gaiman v. McFarland, where we have said it begins to run when the plaintiff learns or should, as a reasonable person, have learned that the defendant was violating his rights? I know there was actual notice in consumer health, but some of our other cases don't require actual notice. Well, Gaiman comes before consumer health. It's a 2004 case. Consumer health comes later, adopts what was in the Ninth Circuit under Seven Arts. Are you saying we overruled Gaiman in consumer health? I don't believe that Gaiman deals with a case of—so we have co-authors that both know that they're co-authors, right? It's a little—it's just different because they both know that they're authors of this—I believe it was a comic strip characters in Gaiman, and so they both know it. Here in our situation with Frank, he doesn't even know he has these ownership rights. So how do you repudiate something to someone without them knowing what they have? So Gaiman has this—they're both co-authors, and so it's an easier hurdle to meet because they know they created the work. But here, even what the district court relied on was this power of attorney, which was not communicated to Frank. It was something that Frank did himself. It doesn't mention copyright ownership or copyrights at all, and obviously— Why wouldn't the personal items be any kind of copyright fall within personal items? It was household goods. So the power of attorney— No, it was both. It was personal and household items. On the power of attorney. Right. But that's created by Frank. Under the repudiation accrual rule, it has to be plain and express and communicated to. So he doesn't even know, even when he's— But that's—he's transferring one-third of his interest in it, which implies he knows he has an interest. Under the rules of intestate succession. Correct. He would at least understand the rules of intestate succession, but he had been told that everything else had been given to Blasey. He had been told it, and based on that concealment— But the personal item—this suggests to me that he thought he had a right, at least as of 2005, because he's transferring that to Lester. He is asking Lester to act on his behalf. Once he sees the household goods being moved out of the house, he believes that he likely has some possession to the household goods. But as to copyright— It's not limited to household goods, though. Or personal items. Why wouldn't copyrights fall within there? He didn't know he had them. That's a little circular. Ms. Hesse, you have—you wanted to reserve some time for— I did. You want to save the last minute, 30, for rebuttal? Yes, I would. Okay. Very well. Mr. Pulliam. Good morning, Your Honors, and may it please the Court. Daniel Pulliam on behalf of Appellees. I want to start with this concept of knowledge. Can we start with, though, when he makes the statement, everything has been left, everything, to LaSalle, why is that an express and plain repudiation of Frank's copyright interest? When Dr. Sumrall makes the statement? When it's Stephen. When they're—when this—everybody's relying on this statement. Oh, I see. For the right of publicity. The challenge of that is that the right of publicity under Indiana law can only be transferred by six specific methods. It cannot be done through the theory that has been postulated in the briefs here on appeal or in the complaint. You need a specific writing that specifically states that I am disclaiming my right of publicity. There are other ways to do that here, but the theory that has been put forth before this Court has to be in writing. And there's two layers of law, too. There's the Internal Revenue Code, which dictates ways you can disclaim your inheritance, essentially. Now, under Indiana right of publicity, it aligns with that statute and requires it to be in writing, and you're also not allowed to direct who it goes to. And it essentially works that if you disclaim your inheritance, if my ancestor passes away and I'm entitled to something, the law treats me as if I will then pass that right of publicity on through the intestate succession statute. So there is no theory in the complaint that I can see or on appeal that would allow them to amend and put in facts saying that Frank's brothers somehow disclaimed this so that the rights of publicity go back to Frank. Now, perhaps there's a theory out there where he disclaimed them and somehow transferred them to Laissez, but that's not alleged in any sort of way that abides by or complies with Indiana law governing right of publicity. It's just not there in the pleadings, and attempting to do it now on appeal is a little too late. Does that answer your question? Yes. Turning to knowledge, I wanted to point out the Stone case from the Second Circuit. In that case, a pretty significant fact was left out is that Hank Williams' daughter didn't know she was his daughter. Here, Frank unquestionably knew in 1996 who his father was. He knew his father passed away. Does it matter that the evidence of repudiation here doesn't specifically address the copyrights as Ms. Hesse was arguing? For the copyrights, yes. It would need to be in writing and to be specified. Are you speaking to the will? I'm speaking to the 2005 document that Frank executed. In terms of giving him knowledge? Giving Lester the authority to pursue any interest he had. It gave Lester sufficient knowledge and information that there might be rights out there for him. My question is, is it sufficient that he had knowledge there might be rights, or does it have to be more specific to copyrights? I don't think it needs to be any more specific. What are you basing that on? Based on the fact that the case law allows for any number of circumstances or facts to give an individual rights holder potential knowledge that you may be entitled to a claim, to ownership of a copyright. Is there a specific case that says that? I'd have to circle back with you on that. If it wasn't then, it was earlier in 1996 when his father passed away. Everyone knew what a prolific author that Dr. Somar was who had those rights. You don't have to have a will in front of you or a document in front of you to know under Indiana law that you are an heir of an individual who had built a worldwide ministry under the laws of intestate succession, under Indiana probate law. He was entitled to go to probate court and say, I'm an heir. I'd like to open an estate. Your point, I think, is that under consumer health at that moment in time, he had to exercise reasonable diligence and inquire as to whether he held a right. Correct. And at the time, that would have been the opportunity to hash out the degree to which Dr. Somar did as he said he did, which was do everything on behalf of the church. That would have been the time to depose witnesses, to find out this theory that somehow he had this alternative revenue stream and that he wasn't committed his life to the church he built. It could have been explored. It wasn't. And the reason for that, as the record shows, is that everyone believed at the time he died that he had done what he said he did, which was give everything to the church. That's an undisputed fact. Yeah, and I think you're saying a fair inference, too, is that it's inconceivable that people would not have been thinking about copyright interests. Given Dr. Somar Senior and his ministry and his writings and what he did as part of his evangelization work. Intellectual property? It's not a case about where are the dump trucks going or where is the vacation land going or something. It's all about publications that he pursued in furtherance of his ministry. I agree and would welcome additional questions on that point. Turning to the sham affidavit, the judge's order outlined three general areas where the affidavit contradicted or was inconsistent with deposition testimony. I think the primary example would be the question regarding the purpose of the trip. He didn't testify that it was a personal trip. He also could not remember at the time of his deposition how the photograph got to Lassay. The purpose of the trip was either to visit the underground church or to, as I think it was his testimony, how the church was when Dr. Somar found it in the 1950s. We're not sure which it was. It doesn't really matter. The judge was well within his discretion, as this court has held repeatedly, to disregard that affidavit. Whether or not he used the word sham affidavit, the cases cited by the judge in his order are all what I put under the heading the sham affidavit rule. On this particular point, there seems to be some reliance upon what is perceived or believed to be a conflict between the fair inferences you can take away from grandson Lester's LinkedIn page. Are you with me on that? Yes. The LinkedIn page and just his testimony about the trip to China and the taking of the traveler photo and all that. Isn't that something that should just get sorted out beyond summary judgment? This is the one point that is made on the other side. There's a lot of sorting through facts and what's credible and what's not credible with respect to this aspect of the claim focused on the traveler photo. Yes. I'd say the district court order was very careful. There are disagreements of fact. Lester's affidavit does put in new bits of information in an attempt to create an issue for trial. I think the district court's decision to disregard that, set that aside, he didn't consider it, is entitled to discretion. I'd say separately, the bigger issue here goes to that LinkedIn profile. Lester publicly proclaimed on LinkedIn and elsewhere over the years, it's been a while, is a theme of this case. Some of this evidence is a little bit old, that I served Dr. Sumrall in whatever he needed. He testified that he had this biblical relationship. I believe it was Elijah and Elisha. I did everything for you. Everything I did was for you. With that, there's evidence showing that part of his job was to publicize the ministry. It was an evangelical-type ministry where the point was to get out there and tell people about what was happening in the world. That's what the evidence shows. And that's the fundamental ground rock basis for saying, well, given all that, that you were out there saying, I did everything for him, you don't get to come in here now and find one particular photograph, put in an affidavit showing how that photograph's negative got to Laissez and say, that's mine. So putting the affidavit aside, I don't think there's much dispute on the material facts. What about his testimony? I believe this was in his deposition, that he's just a pastor and didn't cover photography. Just a pastor's a big job. And I think with that, he did say that he was his grandfather's assistant and did whatever he needed. And so, yes, he was a pastor. Yes, he did make, I think it was $19,000 a year. But he also traveled extensively. There's evidence in the record of the places I've never heard of that they went to together. They were all over the world together. And this is the one trip, according to the affidavit, that the district court was supposed to find created an issue of fact of this one trip with this one photograph. Yeah, I had a take. So in kind of cutting against the question I asked you earlier, I thought it's possible that there's two worlds that can exist at the same time here. It's possible that the grandson traveled with his grandfather as part of a family bonding trip, as part of a grandfather-grandson trip. I'm willing to believe that, given the age of Lester at the time. But I don't know that that rules out the possibility that the photograph that was taken, the traveler photograph in particular, was made for the ministry. And the reason I say that is because it sure seems to me, from everything I've read here, that if Dr. Summerall was about anything, it was about promoting in furtherance of the evangelical mission, and one way of promoting was photographs. That the traveler photograph was not the first time that he was using a photograph to promote his ministry. So both propositions can be true. It may well be a personal grandfather-grandson trip, but that doesn't inevitably lead to a conclusion about the traveler photograph. I think that's fair. And with that, the fact that it might have been a personal camera doesn't change the fact that my use of my personal iPhone on this trip to send an email to my colleagues doesn't turn – it's still my personal device, but it can also create business type related documents, just like this photo did. So I'd say that and other facts showing that, yes, they do have personal lives. Yes, he used a personal – perhaps he used a personal piece of equipment. It doesn't change the underlying current of the facts that show that everything that Dr. Summerall did was on behalf of the church, and that Lester was doing anything his grandfather needed him to do in furtherance of that. And the nature of the photograph supports that, right? It's not a picture of grandfather and grandson before they had a dinner, before they went on a walk, or something like that. It's a picture right in the middle of Dr. Summerall's ministry. I wouldn't characterize it as a family type photograph. I would agree with that assessment. You would not? Or you said you would? I would not characterize it as a family photograph. Right. The fellow in the picture is not a family member, right? No, no. We don't know who that individual is. On the merits of the federal copyright claim, you spent some time talking about this implied license to use his works, but I don't see in the record where LaSalle requested Dr. Summerall to put that in writing. I think the formalities – you're saying Lester? No, Dr. Summerall. The formalities of Dr. Summerall's copyright, he published hundreds of books. A lot of them were published directly through LaSalle, others through others. I think that at times publishers would send him documents already completed and filled out, and that's how it ended up being. I think the more important fact that shows that Dr. Summerall meant what he said in the everything I do is on behalf of the church is that there is no single record in decades of tax returns showing that he ever recorded income from a copyright source. And there's, I believe, a line that says, indicate as such. Instead, as I think our briefs say, his only revenue was through the goodwill offerings he received perhaps at his birthday and Christmas. So I'd say in terms of an implied license, it was through his actions of taking any checks he happened to get. We'll never know for sure, but everything shows that he put everything he received from his publications towards the ministry. I think the undisputed facts that everyone knew at the time Dr. Summerall died that he was committed to giving everything to his ministry, that is an undisputed fact. The fact that Lester worked for the ministry at the time that he was performing a ministry-like function and taking a photo of his father, these uncontested facts anchor the basis for affirming the district court. And there's really no disputed facts that justify a trial on any of these issues or counts, unless there are further questions. Okay, hearing none, Mr. Pulliam, thank you very much. Thank you. Tessie, you have some time left. I'd like to address the traveler photo for a minute. What's interesting is that there is not, if it was a Lacie sponsored trip, there's just not one piece of evidence that was provided that Lacie paid for it, that Lacie had an agenda, that Lacie had anything. We had received flight records from the 1950s, but nothing as to this China trip. There was just nothing that would give an indicia that this was Lacie sponsored. Not only that, but if Lester, given all of his travels with his father, had been in charge of taking photographs, then you would think there would be one other photo that he had provided Lacie. Just one. After all these trips, there wasn't. Not one. Just this traveler photo is what they claim is theirs. And then lastly on the traveler photo claim, the idea was submitted that everybody had to do this. Everybody had to take pictures and the Lacie camera was used. We know that's not true here. We know that Lester's personal camera was used because it had a unique date stamp that was placed on the picture. I don't think that's contested, is it? No. That it was Lester's camera, he paid for the pictures to be developed, and that he still had all the other pictures from that China trip, including the negatives. So those undisputed facts tend to suggest that this was just not a Lacie-sponsored trip and it wasn't within the scope of his employment, given the restatement factors of time and space had to be considered with respect to whether it was within the scope. It certainly wasn't within the space of being an associate pastor in South Bend, where there's no dispute that he was doing weddings and funerals and he ran the booth. Okay. We understand your position. Do you have any final thought you want to leave us with? Time's expired. The final thought on this is just the Mikowski case and the Indiana concealment rule. So in Indiana, there is the concealment of actions statute with respect to, and if something is being concealed, especially where there's a duty to speak. So while they're... Okay. We'll take a look at it. Okay. We appreciate it. I know it's in your brief. Yeah. I recognize what you're saying. Yes. Okay. Very well. Thanks to you. Thanks to your colleague. We'll take the appeal under advisement.